## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


JESSIE ADKINS now emancipated,      :
NANCY ADKINS, by and through her    :
Guardian, Karen Adkins and         :
Karen Adkins, as the Administratrix  :
of the ESTATE OF R. THOMAS ADKINS :
JR. a/k/a THOMAS R. ADKINS, JR.   :
        Plaintiffs             :
                          :
  VS.                     :    3:CV-01-0470
                          :
LUZERNE COUNTY CHILDREN &     :    (CHIEF JUDGE VANASKIE)
YOUTH SERVICES OF LUZERNE COUNTY, :
CAROL GALLI, DIANE RADZWILKA,    :
COUNTY OF LUZERNE, FRED TOLERICO, :
BOROUGH OF DALLAS, JACK FOWLER,  :
STAN JEZEWSKI               :
        Defendants         :

### MEMORANDUM


      This action concerns the alleged deprivation of constitutional rights arising out of the

compelled removal of Jesse and Nancy Adkins from their father's home for a period of four days

while medical examinations and tests on the children were conducted.  Plaintiffs are the Estate

of Dr. R. Thomas Adkins, Jr. (who passed away during the pendency of this litigation), and his

two children, Jesse and Nancy Adkins.[1]  There are four categories of Defendants: (1) Luzerne

---

     [1]For sake of simplicity and convenience, the Estate Plaintiff will be referred to in this
opinion as Dr. Adkins.

County Children & Youth Services ("CYS") and two of its employees – Carol Galli and Diane Radzwilka; (2) the Borough of Dallas and its Chief of Police, Jack Fowler; (3) Luzerne County and its Chief Detective, Stan Jezewski; and (4) Pennsylvania State Police Trooper Frederick Tolerico.  Plaintiffs claim that the removal and medical examination of the children without a court order violated substantive due process and their Fourth Amendment right to be free from unreasonable searches and seizures.  Recovery is sought under 42 U.S.C. § 1983.

Each category of Defendants has separately moved for summary judgment on all claims. Because Defendants established that they had "reasonable and articulable evidence" justifying their decision to remove Dr. Adkins' children from the family home and directing the children to undergo medical examinations, summary judgment on Plaintiffs' Fourteenth Amendment substantive due process claim will be granted in Defendants' favor.  Because the evidence presented supports a conclusion that the Defendants acted as a "reasonable guardian" by ordering Dr. Adkins' children to undergo medical examinations in order to determine whether they were poisoned or suffering from a serious illness, summary judgment on Plaintiffs' Fourth Amendment claim will also be granted in favor of Defendants.

## I. BACKGROUND

### A. Factual Background

Defendant CYS is an agency of Luzerne County and Defendants Diane Radzwilka and Carol Galli were at all times relevant to the events in this case employed by CYS as intake case

workers.  Defendant Frederick Tolerico is a Trooper with the Pennsylvania State Police.

Defendant Jack Fowler is the Chief of Police for the Borough of Dallas.  Defendant Stan

Jezewski was the Chief Detective in the Luzerne County District Attorney's Office at the time

relevant to the events in question.

Dr. Adkins was a licensed physician, and at the time in question, was employed at both

Mercy and Berwick Hospitals as an emergency physician. (Adkins Dep. at 14-15)  He is the

father of Plaintiffs Jessie and Nancy Adkins.  At the time of the incident in question, Jessie was

thirteen (13) years old and Nancy was four (4) years old.  Jessie Adkins' mother was Mary

Adkins, Dr. Adkins' first wife, who died on June 17, 1990, at the age of forty (40) of "presumed

natural causes."  In April of 1992 Dr. Adkins remarried.  His second wife, Delinda, was the

mother of Nancy Adkins.

Delinda Adkins died on January 17, 1999 at the age of thirty (30), allegedly from

"hemorrhagic interstitial pneumonitis."  However, the "Amended Postmortem Report" for Delinda

Adkins, which was completed by Dr. Hudock as part of an investigation into the cause of her

death, indicated the cause of death as "undetermined," and the manner of death as "could not

be determined."  Although the cause of Delinda Adkins' death was listed as "undetermined," Dr.

Hudock lacked any medical evidence that even suggested that she died from anything other

than the flu. (Hudock Dep. at 16, 28.)  Nonetheless, a criminal investigation of her death was

undertaken.

Two months after Delinda Adkins died, on March 18, 1999, at approximately 9:30 a.m., Dallas Borough Police Officer James Drury received a call at the police station from a confidential informant regarding the welfare of Dr. Adkins' children.  The confidential informant told Officer Drury that the four year-old daughter, Nancy, had told the informant that Karen Sherman, Dr. Adkins' girlfriend at the time,[2] stated to Nancy that she and her sister would soon be going to heaven to be with their mother. (See Victim/Witness Statement Form at 1, 4.) Officer Drury immediately notified Chief Fowler of the information he received from the confidential informant.  Chief Fowler then proceeded to contact Trooper Tolerico of the Pennsylvania State Police and Detective Stan Jezewski of the Luzerne County District Attorney's Office to inform them of the report he received from the confidential informant. Defendants Tolerico and Jezewski had participated in the investigation of Delinda's death.

At approximately noon on that same day, Chief Fowler, Trooper Tolerico and Detective Jezewski personally interviewed the confidential informant, who had a close and trusted relationship with the Adkins' family.  The law enforcement officers were acquainted with the informant through their investigation into Delinda's death.  At that time, the confidential informant signed a written affidavit stating:

> Nancy said Karen told her that she and her sister Jessie would be
> going to heaven soon to be with their mommy. [ ] Nancy then
> started crying and said that she knows she can only go to heaven if
> she dies, and she doesn't want to die.

---

[2]Dr. Adkins would later marry Karen Sherman.

. . . .

> When Karen told Nancy that she was going to heaven soon to be
> with mommy, she told her not to tell anyone, because this is a
> secret.

(Victim/Witness Statement Form at 1, 4.)  The confidential informant also stated that Nancy "has been sick several times since Delinda's death" and had run a fever of one-hundred and four (104) degrees, a runny nose, and a terrible cough.  Furthermore, the confidential informant claimed that Dr. Adkins had not taken Nancy to the doctor, despite repeated bouts of sickness. (Id. at 2-3.)  The confidential informant had access to Dr. Adkins' children sufficient to establish the reliability of her assertions as to the children's condition.

A telephone conference ensued involving former Luzerne County District Attorney Peter Paul Olszewski, Jr.,[3] Michael Dessoye, Chief of County Detectives for Luzerne County, and Stan Jezewski.  The District Attorney was aware of the investigation into Delinda's death and the suspicions concerning the passing of Dr. Adkins' first wife.  Based on this conference a decision was made by the District Attorney to take protective custody of Dr. Adkins' children to assess their condition and to utilize CYS to find an appropriate location for the children until the proceedings could be concluded.  Information relating to the investigation of Delinda's death and information supplied by the confidential informant led the District Attorney and the

---

[3] District Attorney Olszewski was subsequently elected Judge of the Court of Common Pleas of Luzerne County, the position which he currently maintains.

Defendants to conclude that the children were in imminent harm.  This information included: the suspicious circumstances surrounding the untimely deaths of Mary and Delinda Adkins; the alleged extramarital affair between Dr. Adkins and Karen Sherman; the fact that she moved in with Dr. Adkins shortly after Delinda's death; Dr. Adkins' prescription of numerous medications for Delinda between August of 1998 and January of 1999, using multiple pharmacies; the suspension of Dr. Adkins' medical license by the state of Maryland; the flu-like symptoms reportedly suffered by the children, similar to those suffered by Delinda Adkins prior to her death; and Karen Sherman's statement to Nancy Adkins that she would soon be joining her mother in heaven.  (Olszewski Dep. at 31-34, 37, 48-49, 67; Fowler Dep. at 32, 37-40; Jezewski Dep. at 20-21, 36, 54; Tolerico Dep. at 60, 140.)   After the decision was made to take the children into protective custody, District Attorney Olszewski relayed the information to Jacquelyn Maddon, Social Services Coordinator for CYS, and informed her that he would make arrangements for Geisinger Medical Center to have the children examined medically . (Maddon Dep. at 35.)  Maddon then assigned Carol Galli and Diane Radzwilka to the case. (Id. at 13-15.)

On Thursday, March 18, 1999, at approximately 5:00 p.m, Galli, Radzwilka, Chief Fowler, Officer Drury, Trooper Tolerico, and Jezewski arrived at Dr. Adkins' home for the purpose of taking Dr. Adkins' children into protective custody.  After consulting with District Attorney Olszewski, Jezewski informed the parties present that it was not necessary to obtain a search warrant in order to take the children into protective custody.

When Dr. Adkins opened the door to his home, he was advised of the concerns regarding the health and welfare of his children and he was further advised that it was the intention of the law enforcement and CYS personnel to remove his children from his home and place them in protective custody without his consent.  Dr. Adkins suggested that Defendants call the children's school and their pediatrician, but was told that the children had to be removed.[4]  Diane Radzwilka and Carol Galli advised Dr. Adkins that his children would be taken to Geisinger Medical Center the following morning for an exam and then proceeded to review options for the temporary placement of the children. (Radzwilka Dep. at 36; Galli Dep. at 67-68.) After further discussion, Dr. Adkins agreed that his children could be placed with Samantha Spencer, a friend of Delinda Adkins, who helped out babysitting three days per week and lived one-hundred and fifty (150) yards from Dr. Adkins' home.  Dr. Adkins also agreed to allow the caseworkers to access the children's medical and school records and signed a release to that effect.  However, Dr. Adkins was not presented with a written release authorizing medical examinations of his children.

On the morning of March 19, 1999, Dr. Adkins obtained legal representation, based on

---

[4]On March 19, 1999, the children's pediatrician was interviewed and said she hd no concerns about potential abuse.  School officials were also contacted on the 19th of March, and they said that Jesse's absences were not unusual given the recent passing of Delinda, and Nancy was in a non-mandatory program.

his belief that a "shelter care" hearing was going to take place later that day.[5]  (Adkins Dep. at

90-91, 258-59, 324.)  Dr. Adkins' attorney negotiated an agreement with CYS, that was

approved by the District Attorney, whereby his children would remain with Samantha Spencer

until Monday, March 22, 1999, while they awaited the results of the medical examinations.  Dr.

Adkins was also permitted to visit his children at Ms. Spencer's home over the weekend.  This

negotiation allowed the parties to avoid a shelter care hearing. (CYS's Sealed Exhibit "F" at 26.)

On March 19, 1999, the children were taken to Geisinger Medical Center and examined

by Dr. Cordes.  He conducted a physical examination of both children and ordered urine and

blood tests.  (Cordes' Answers to Interrogatories at 30-32.)  Dr. Cordes also ordered a precious

metals scan to rule out exposure to any potential toxins.  (Id. at 36-37.)  The results of Dr.

Cordes' physical exam and medical tests indicated that both of Dr. Adkins' children were in

good health. (Id. at 47.)  The children were returned to Dr. Adkins on March 22, 1999.

## B. Procedural History

Plaintiffs initiated this action with the filing of a Complaint on March 16, 2001.  On April

14, 2003 Defendants Borough of Dallas and Chief of Police Jack Fowler filed a motion for

summary judgment (Dkt. Entry 90) with a brief in support of the motion (Dkt. Entry 91).

Defendants CYS, Carol Galli and Diane Radzwilka also filed a joint motion for summary

---

[5] Under Pennsylvania law, a hearing is to be held within 72 hours after a child is
removed from a parent's custody to determine whether continued removal of the child from the
parent is required.  See 42 Pa. Cons. Stat. Ann. § 6332(a).

judgment (Dkt. Entry 108) on April 15, 2003.  Defendants Stan Jezewski and Luzerne County

filed a motion for summary judgment (Dkt. Entry 109) with a brief in support of the motion (Dkt.

Entry 110) on April 15, 2003.  State Trooper Frederick Tolerico filed a motion for summary

judgment (Dkt. Entry 112) with a brief in support of the motion (Dkt. Entry 114) on April 15,

2003.  Plaintiffs filed a single consolidated brief in opposition to all motions for summary

judgment (Dkt Entry 123) on June 2, 2003.  Defendants CYS, Carol Galli and Diane Radzwilka

filed a reply brief to Plaintiffs' brief in opposition (Dkt. Entry 127) on June 12, 2003.  Defendant

Frederick Tolerico also filed a reply brief to Plaintiffs' brief in opposition (Dkt. Entry 128) on June

19, 2003.

Dr. Adkins passed away following the submission of the summary judgment motions.  By

Order entered on February 10, 2005, substitution of parties was directed and oral argument on

the pending motions was scheduled for March 4, 2005.  The Court was later informed that an

estate for Dr. Adkins had not been opened and a guardian had not been appointed for Nancy

Adkins.[6]  Consequently, litigation of this matter was stayed pending the appointment of persons

who could authorize this litigation to proceed on behalf of Dr. Adkins and his daughter, Nancy.

By Order entered on May 31, 2005, Karen (Sherman) Adkins was recognized as the Executrix

of the Estate of Dr. Adkins and as the guardian of Nancy, and oral argument on the pending

motions was re-scheduled.  Oral argument occurred on July 19, 2005. This matter is ripe for

---

[6]Jesse Adkins attained the age of majority during the pendency of this matter.

9

disposition.

## II. DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, and the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### A. Substantive Due Process Claim

Plaintiffs have asserted a substantive due process claim.  Specifically, Dr. Adkins claims that the removal of his children from his home by the defendants violated his "fundamental liberty interest in the care, custody and management of his children." (Complaint at ¶34)

The Supreme Court has held that where abusive government action is alleged, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  "To generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999) (internal citation omitted)   "Mere negligence is never sufficient for substantive due process liability." Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000). "Because, conduct that 'shocks the conscience' under one set of circumstances may not have the same effect under a different set of circumstances, the standard of culpability for a substantive due process violation can vary depending on the situation." Rivas v. City of Passaic, 365 F.3d 181, 195 (3d Cir. 2004).

The Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child[ren]." Santosky v. Kramer, 455 U.S. 745, 753 (1982).  There are, however, "cases in which a child services bureau may be justified in

removing either a child or a parent from the home, even where later investigation proves no abuse occurred." Croft v. Westmoreland County Children and Youth Services, 103 F.3d 1123, 1126 (3d Cir. 1997).  As stated in Croft, "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id.  The test, as set forth in Croft, is "whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with [parents'] rights as the child[ren's] parents." Id.  Consistent with this constitutional standard, the Pennsylvania Juvenile Act provides that "a child may be taken into custody . . . by a law enforcement officer or duly authorized authority of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary." 42 PA. CONS. STAT. § 6324(3).

In Miller v. City of Philadelphia, 174 F.3d 368, 376 (3d Cir. 1999), the court explained that the test articulated in Croft was an application of the substantive due process "shocks the conscience" standard.  That is, the government action must be "so ill-conceived or malicious that it 'shocks the conscience.'" Id. at 375.  In the context of the removal of a child from the parents' home, the social worker's conduct "must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Id. at 375-76.

12

The evidence presented by Defendants has established that there were reasonable grounds to believe that Dr. Adkins' children were in imminent danger of harm, thus justifying their compelled removal.  The investigation into the welfare of Dr. Adkins' children began when Officer Drury received a telephone call from a reliable informant, who expressed concern that Dr. Adkins' children may be in danger of death or serious illness.  The informant was known to the law enforcement officers to be a close and trusted acquaintance of Dr. Adkins and his family.  Upon receipt of the call, Officer Drury immediately contacted his supervisor, Chief Fowler, who in turn contacted Trooper Tolerico and Detective Jezewski because they were both assisting the Dallas Borough Police Department with the investigation into the "suspicious" death of Delinda Adkins.  After all the parties were contacted, the confidential informant was interviewed and disclosed to the police that Dr. Adkins' girlfriend, Karen Sherman, had told his four year old daughter Nancy that she and her sister would soon be joining her mother in heaven.  Karen Sherman also told Nancy to keep this a secret.  When Nancy told the informant of Ms. Sherman's statement, Nancy began crying because she realized that the only way to get to heaven was to die and she told the confidential informant that she did not want to die.  The confidential informant also disclosed to the law enforcement agents that Nancy had been suffering from flu-like symptoms since Delinda's death, which include a temperature as high as one-hundred and four degrees, along with a runny nose and cough.  Furthermore, the confidential informant claimed that, despite these flu-like symptoms, Dr. Adkins had not taken

Nancy to her pediatrician to have her examined and possibly treated.

Although "[a]n anonymous tip may justify investigation . . . it will not provided reasonable grounds for removal of a family member absent independent, articulable criteria of reliability; and certainly not when all evidence is to the contrary." <u>Croft</u>, 103 F.3d at 1126  Unlike <u>Croft</u>, which concerned an uncorroborated <u>anonymous</u> informant, Defendants in this case were dealing with information provided by a well known confidential informant.  Law enforcement officers knew that the confidential informant was trusted by Dr. Adkins and had frequent contact with his children.  The informant's relationship with the children was such that Nancy was willing to tell her what Ms. Sherman said even though Ms. Sherman had asked her to keep it secret.[7]

Moreover, the confidential informant did not provide the information in a vacuum.  There was an outstanding investigation into the "suspicious" death of the 30-year old Delinda Adkins.  As a result of the investigation, law enforcement officers knew that Dr. Adkins' medical license had been suspended by the state of Maryland; both his first and second wife had died at a relatively young age of undetermined causes; he was allegedly having an extra-marital affair with Karen Sherman at the time Delinda died; Sherman moved in with him shortly after Delinda's death; and Dr. Adkins had brandished a weapon in a hospital emergency room.  Such objective evidence, when combined with the information provided by the confidential informant

---

[7]Plaintiffs have not presented any evidence to dispute that Ms. Sherman in fact made the statement to Nancy.  Nor have they contested the fact that Ms. Sherman told Nancy to keep it secret.  On the contrary, Plaintiffs characterize the statement as falling "within the realm of caring words that an adult caretaker may say."  (Pl. Brief in Opp. at 20.)

about Sherman's statement to Nancy and the children's frequent flu-like illnesses and absences from school, provided  reasonable grounds to conclude that Dr. Adkins' children were in imminent danger of harm if they were not removed from his custody.

Plaintiffs claim that Defendants should have conducted further investigation before taking such drastic action.  Plaintiffs assert that the investigation should have at least included contacting the children's school, pediatrician or other individuals with knowledge of the family before deciding to remove the children from their home. (Pl.'s Br. in Opp. at 20.)  While the advantage of hindsight suggests that a comprehensive investigation could have allayed concerns and avoided removal of the children, the failure to complete such an investigation before deciding to act does not show an arbitrary abuse of government power.  See Patterson v. Armstrong County Children and Youth Services, 141 F. Supp. 2d 512, 524 (W.D. Pa. 2001). The fact remains that the evidence in  Defendants' possession was sufficient to establish a reasonable suspicion that Dr. Adkins' children were in imminent danger of harm.  Defendants had a reasonable basis for concluding that Dr. Adkins' children needed to be removed from his custody pending the completion of a sufficient medical examination of the children.  Their conduct was not grossly negligent or so arbitrary as to "shock the conscience."  They were confronted with difficult circumstances.  That they may have overreacted to the situation does not support a finding that the removal of the children for a period of four days to assure their health and safety was conscience-shocking.

Certitude was not required of Defendants before they took action.  All that the constitution required of Defendants on March 18, 1999 was that they have "reasonable and articulable evidence" giving rise to reasonable suspicion that the children were in imminent danger of harm.  <u>Patterson</u>, 141 F. Supp. 2d at 525.  Since they have presented such "reasonable and articulable evidence," Defendants are entitled to summary judgment on Plaintiffs' substantive due process claim.

### B. Fourth Amendment Claim

Plaintiffs have also asserted a claim based on the alleged deprivation of their Fourth Amendment right to be free from unreasonable searches and seizures.  To prove a claim under the Fourth Amendment, a plaintiff must show that the defendants' actions (1) constituted a "search" or "seizure" within the meaning of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances.  Defendants do not contest that their actions constitute a "seizure" under the Fourth Amendment.  They claim, however, that their actions were reasonable under the circumstances.

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."  <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979).  When determining whether a government seizure violates the Fourth Amendment, the seizure must be examined for its overall reasonableness. <u>See</u> <u>Soldal v. Cook County, Ill.</u>, 506 U.S. 56, 71 (1992)("'reasonableness is still the ultimate standard' under the Fourth Amendment") (citation

omitted).  The analysis must be based upon a "careful balancing of governmental and private interests." Id. (quoting New Jersey v. T.L.O., 469 U.S. 325, 341 (1985)).

"It is well-settled that 'in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court.'" Brown v. Daniels, 128 Fed. Appx. 910, 914-15 (3d Cir. 2005) (citing Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir.1997)).  "The state may intervene in the relationship between parent and child where intervention serves the interests of the state or the interests of the child." Winston by Winston v. Children and Youth Services of Delaware County, 748 F. Supp. 1128, 1134 (E.D. Pa. 1990).

As set forth above, Defendants had a reasonable basis for concluding that Jesse and Nancy were in imminent danger.  Defendants acted reasonably, placing the children in the care of a trusted friend of Dr. Adkins and only for a brief period of time to assess their condition and conduct medical examinations.  Thus, the compelled removal of the children did not offend the Fourth Amendment.

The government's interest in conducting the medical testing on the Adkins' children was to ensure the health and safety of the children.  In order to do this, Defendants believed it was necessary to have an independent physician perform a series of tests to determine if the children were suffering from an illness or had been poisoned.  Dr. Adkins' children were thus

forced to undergo medical testing without his consent.[8]  It is well established that governmental

taking of bodily fluids constitutes a search within the meaning of the Fourth Amendment.  See

Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 652 (1995), Wilcher v. City of Wilmington,

139 F.3d 366, 373 (3d Cir. 1998).   Therefore, the Court must determine whether the medical

tests were "reasonable" under the circumstances.  Soldal, 506 U.S. at 71.  When considering the

constitutionality of a medical exam ordered by a government agency without a warrant or the

party's consent, the Supreme Court has established a "special needs" analysis,[9] which directs

the courts to consider three factors:  (1) the nature of the privacy interest upon which the search

intrudes; (2) the extent to which the search intrudes on the individual's privacy; and (3) the

nature and immediacy of the governmental concern at issue, and the efficacy of the means

---

[8] Defendants contend that Dr. Adkins did in fact consent to the medical examination of his children because he never specifically refused to permit such testing to take place. However, the mere fact that Dr. Adkins did not specifically refuse to authorize Defendants to perform medical tests does not constitute consent.  Dr. Adkins believed that he could not prevent the Defendants from removing his children and forcing them to undergo medical testing. (Adkins Dep. at 173.)  Dr. Adkins only expressly consented to the release of his children's medical records, not the medical examination of his children.  If Defendants wanted Dr. Adkins' consent to perform medical examinations on his children, they could have easily presented him with a consent form, as they did for the release of the children's medical records.  Accordingly, this Court will not infer Dr. Adkins' consent from his failure to expressly object to the medical testing.

[9] "Special needs" are those needs "beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (internal quotation marks omitted).

employed by the government for meeting that concern. <u>Vernonia School Dist.</u>, 515 U.S. at 653-61.

At the time of the medical examinations, the state had assumed custody of the children. "The relevant question is whether the [medical examination] is one that a . . . reasonable guardian . . . might undertake." <u>Id</u>. at 665.  In light of the evidence available to Defendants at the time, which indicated that Dr. Adkins' children might have been poisoned or in imminent danger of harm, it was reasonable to direct the children to undergo medical testing.

Next, the Court must consider the degree to which the medical testing intruded on the children's privacy.  The medical test that were performed on the children consisted of a blood test and urinalysis.  In addition, a throat swab was conducted on Jessie Adkins.  There is no question that the tests performed were invasive.  It is, however, the degree and reasonableness of the invasion which is determinative of a constitutional violation.  The Supreme Court has held that the intrusion occasioned by a blood test is not significant since such "tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for the most people the procedure involves virtually no risk, trauma, or pain." <u>Schmerber v. California</u>, 384 U.S. 757, 771 (1966).  The urine samples were obtained in a medical environment at Geisinger Medical Center by a licensed physician, Dr. Cordes.  Thus, the extent of the intrusion on the children's privacy was not unreasonable.

19

Furthermore, the tests performed on the children were specifically limited to the detection of a serious illness or indications of poisoning. The ultimate goal of the tests was to determine whether Dr. Adkins' children were being abused. Plaintiffs, however, argue that the decision to provided the results from the medical tests performed on Dr. Adkins' children to the pathologist performing an autopsy on Delinda Adkins proves that the test were arranged in order to further the investigation into Delinda Adkins' death and not to ensure the safety of the children. (Pl. Br. in Opp. at 25.) This argument is without merit. The fact that the results of the children's medical tests were disclosed to the pathologist does not suggest an improper motive. On the contrary, comparison of information obtained by the pathologist with the results of the medical testing could assist in determining whether the children were in imminent harm.

The final factor which the Court must consider is the "nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by the government for meeting that concern." Vernonia School Dist. 47J, 515 U.S. at 660. Defendants' concern in this case was ensuring the health, welfare, and safety of Dr. Adkins' children. Defendants had been presented with evidence that Dr. Adkins' children were exhibiting flu-like symptoms that were left untreated and they were missing school. Defendants' concern for the children was immediate, as their lives were potentially in imminent danger of harm. With respect to the efficacy of the means for addressing the aforementioned concern, subjecting Dr. Adkins' children to medical testing was plainly an effective means for determining whether they were

actually poisoned or suffering from a serious illness.

In short, the actions taken by Defendants were an appropriate and effective means of resolving the concern of the potential abuse of Dr. Adkins' children.  In light of the statement made by Karen Sherman to Nancy Adkins and the potential harm that Dr. Adkins' children faced if Defendants had failed to intervene, a "reasonable guardian" would in fact have undertaken this course of action.  Consequently, the compulsory medical examinations were reasonable, and did not violate either Dr. Adkins' or his children's Fourth Amendment rights.[10]

## III. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment will be granted.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

Dated: September 2, 2005

---

[10]Because of the absence of a constitutional violation, this Court need not determine whether the individually named defendants are entitled to absolute or qualified immunity.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JESSIE ADKINS now emancipated,          :
NANCY ADKINS, by and through her        :
Guardian, Karen Adkins and              :
Karen Adkins, as the Administratrix     :
of the ESTATE OF R. THOMAS ADKINS       :
JR. a/k/a THOMAS R. ADKINS, JR.         :
        Plaintiffs                       :
                                         :
  VS.                                   :          3:CV-01-0470
                                         :
LUZERNE COUNTY CHILDREN &               :          (CHIEF JUDGE VANASKIE)
YOUTH SERVICES OF LUZERNE COUNTY,       :
CAROL GALLI, DIANE RADZWILKA,           :
COUNTY OF LUZERNE, FRED TOLERICO,       :
BOROUGH OF DALLAS, JACK FOWLER,         :
STAN JEZEWSKI                           :
        Defendants                       :

## ORDER

NOW, THIS 2nd DAY OF SEPTEMBER, 2005, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' motions for summary judgement (Dkt. Entries 90, 108, 109 and 112) are GRANTED.

2. The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiffs.

3. The Clerk of Court is directed to mark this matter **CLOSED**.


<u>s/ Thomas I. Vanaskie</u>
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania